## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

THOMAS LOGAN                                           )
                                                                       )
                                                                       )
       Plaintiff,                                          )
                                                                       )
v.                                                                       )
                                                                       )
OXYGEN MEDIA, LLC                                 )
                                                                       )
       Defendant.                                        )
_____ )

### COMPLAINT
#### (Jury Trial Demanded)

COMES NOW, the Plaintiff, THOMAS LOGAN, (hereinafter referred to as "Plaintiff", "THOMAS" and/or "THOMAS LOGAN"), by the undersigned counsel, and files this Complaint against the Defendant, OXYGEN MEDIA, LLC (hereinafter referred to as "OXYGEN" or "Defendant") presenting to this Honorable Court as follows:

### Introduction

1.      On May 1, 2022, Defendant, OXYGEN MEDIA, LLC published a 0:43:46 minute long for-profit "true crime" documentary television show entitled: **Oxygen Final Moments**, episode ***"The Streets Are Talking"*** (hereinafter referred to as the "Episode") wherein the Defendants made knowingly false declarations and statements that claimed THOMAS was involved in the murder of his friend and that there were "secrets" to be revealed.

2.      Specifically, as one example of the outrageous and reckless conduct of Defendant's publication is when they stated to the world, and to tens-of-millions of customers, that: "[Thomas] was the one who made the call" and "He was the one who got him to come out of the house" and "[Thomas] was the one who put Lamont in a location to be a victim of this murder" and "The

indication was that [Thomas] was plotting to do this to Lamont. There were rumors that he knew it was happening and he helped facilitate it." See the full episode as well as several short "teaser" videos and statements at https://www.oxygen.com/final-moments/crime-news/franklin-scott-executed-lamont-adair-in-broad-daylight (last accessed April 30, 2023).

3.    This Episode was a pre-planned farce to entice viewers to watch the Episode and leave the viewers believing that THOMAS had conspired with Franklin Scott and "set up" the brutal murder of his close friend, Lamont Adair.

4.    In addition to the publications made during the Episode, Defendants continued to make the outrageous claims prior to airing, in teasers, commercials, and after the Episode air date on their website and on their social media pages and streaming services.

5.    Defendants capitalized on the murder of Lamont Adair and his popularity, knowing many in the community and through the nation wanted to know details about his murder and Defendants claimed and misrepresented that they had "Secrets" about his murder and such "secrets" would be shared on this Episode. A "secret" Defendants falsely presented was that THOMAS was "involved" and "set up" the murder despite knowing the entire time this was untrue.

6.    The negative impact and emotional trauma Defendant's caused on THOMAS is profound and has put his life, along with his entire families' lives, at risk for violent retaliation as all viewers were left to speculate and believe that THOMAS was working with the gunman and "helped facilitate" and "set up" the murder of his close friend, an individual loved by so many.

7.    Defendant's conduct was reckless, thoughtless, and so extreme and outrageous as THOMAS already had to bear witness to his close friend's murder – a traumatizing and horrific scene he must live with every day - but also to now be accused by many for "knowing about" and "setting it up" and "helping facilitate it" because of this Episode, Defendants have caused

THOMAS and his entire family to go into social hiding, as they have received death threats, been threatened at their places of employment, and have had to completely avoid all social gatherings in their own communities.

8.    Oxygen completely disregarded how the release of this Episode could impact my client and his family's everyday life, as they completely failed to consider the social constructs in communities like Seat Pleasant, Maryland where violence, revenge and retribution are prevalent. They also completely ignored the emotional well-being of THOMAS, an individual who has already been traumatized by this violent crime.

## **PARTIES, JURISDICTION AND VENUE**

9.    Plaintiff, Thomas Logan is an individual who resides in Prince George's County, Maryland.

10.    Thomas grew up in Seat Pleasant, Maryland, and is a father of (5). His entire social circle and life revolved around being in Seat Pleasant, Maryland.

11.    Defendant Oxygen Media, LLC ("Oxygen"), a wholly owned subsidiary of NBC, is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business being located at 30 Rockefeller Plaza, New York, New York 10112.

12.    Oxygen's taglines and slogans range from "Very Real" to "True Crime" and "New Network for Crime." According to NBC Universal's website, Defendants reaches tens of millions of homes as one of the world's leading media and entertainment companies in the development, production, and marketing of entertainment, news, and information to a global audience. See http://www.nbcuniversal.com/business/oxygen-media.

13.    Defendants publish the Episode in the State of Maryland.

14.    Defendant published its false, offensive and outrageous statements in the State of Maryland.

15.    Defendant published their false, offensive and outrageous statements directly to Plaintiff and millions of others in the State of Maryland.

16.    Defendant conducted interviews and took video footage for the Episode in the State of Maryland.

17.    Defendant owns and operates a Network and Internet publication on Oxygen.com and its publications are regularly made and their website is regularly viewed and accessed in the State of Maryland.

18.    Defendants regularly conduct business, obtained and intentionally seek benefits and profit in the State of Maryland.

19.    Defendants have intentionally sought and obtained benefits and profit from their tortious acts listed herein in the State of Maryland.

20.    This Court possesses jurisdiction pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the Constitution, laws, or treaties of the United States.

21.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), as the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred in this District.

22.    There is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs, and attorneys' fees. Therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

## FACTS

23.     Plaintiff repeats and realleges each and every allegation in the paragraphs within this Complaint as though fully set forth at length herein.

24.     On August 8, 2018, Lamont Adair was tragically murdered while walking down the street to play basketball in Seat Pleasant, Maryland.

25.     Plaintiff, Thomas Logan, was a very close trusted friend to Lamont Adair and the two friends often communicated and met up with each other.

26.     On August 8, 2018, Plaintiff called his friend to meet, however, on his way to meet Lamont Adair, Lamont was approached by his killer and brutally murdered in the street.

27.     Plaintiff, who was otherwise completely uninvolved and unaware of what was happening, was arriving to meet his friend and along with several other eye-witnesses saw him being shot at multiple times by the gunman.

28.     Plaintiff had no idea what was happening and was in fear for his own life and the lives of all others around as he ducked down to avoid being shot as well.

29.     Plaintiff immediately called Lamont Adair's family from the scene and told them their brother had just been shot at Greig Street in Seat Pleasant, Maryland.

30.     At all times, Plaintiff cooperated with the police and detectives by speaking with them and sharing whatever information he had.

31.     The gunman was later identified as Franklin Scott by his ex-girlfriend ("Kenya") who had seen the surveillance videos circulating the news and social media.

32.     Franklin Scott pled guilty to first degree murder of Lamont Adair.

33.     At no time was Plaintiff a suspect or suspected of being involved or working with the gunman in any capacity related to the murder of Lamont Adair.

34.    At no time did anyone who was later convicted or identified as involved in the murder ever name or mention Plaintiff as being involved or working together with anyone to harm his friend.

35.    At all times, Plaintiff cared and respected Lamont Adair and was deeply and will forever be saddened by his friend's death.

36.    Plaintiff will be forever traumatized by the fact that his close friend was murdered in broad daylight right in front of him.

37.    On May 1, 2022, Defendant, OXYGEN MEDIA, LLC published a for-profit "true crime" documentary television show entitled: **Oxygen Final Moments**, episode **"*The Streets Are Talking*"**.

38.    During the Episode, Defendants interviewed and took "real" video footage of the family and friends, as well as the detectives and State's Attorneys who had knowledge or information about Lamont Adair's life and his murder.

39.    At no time did Defendants ever reach out to ask Plaintiff for any information, permission to use his name, or to confirm if any of the statements they made about him were true.

40.    For more than half the episode and for all of the "teasers" created as an advertisement for the Episode, the Defendants portrayed to the audiences that Plaintiff had "worked with" the gunman to "set up" Lamont Adair and "help facilitate" the murder.

41.    The Defendants made statements and portrayed that Plaintiff was jealous of Lamont Adair and his aspiring basketball career.

42.    The Defendants advertised the Episode and promoted the Episode to be about a young man who "just earned the shot to play professional basketball in China" and built up

6

throughout the Episode that because he was a talented basketball player he was killed by those who were jealous of him.

43.    Defendants made many statements about others being "jealous" of Lamont Adair's basketball skills prior to and right before and while making statements and identifying Plaintiff by his name, THOMAS, in the Episode.

44.    Defendants made many false statements insinuating that Plaintiff "set up" Lamont Adair to be in a location to be a victim of murder.

45.    The Defendants made false statements and portrayed Plaintiff in a negative light implying that because Plaintiff had asked Lamont Adair to meet up with him that day that he "knew about" and "helped facilitate" the murder.

46.     Defendants made knowingly false declarations and statements throughout the Episode and advertisements for the Episode and in their teaser videos that claimed Plaintiff was involved in the murder of Lamont Adair and that there were "secrets" to be revealed.

47.    At all times, there were no "secrets" revealed by Defendant, despite them continuing to claim there were "secrets" related to the murder of Lamont Adair.

48.    Defendants exposed throughout the Episode the "secrets" they believed they had uncovered and the first being that others were "jealous" of Lamont Adair's basketball career plans and falsely implied that Thomas Logan was one of those who were "jealous" that he had then been "involved" and "worked together" with the gunman to "set up" Lamont Adair to be murdered.

49.    At all times, including before creating the Episode, during creation of the Episode, before airing and after the Episode Defendants knew that Thomas Logan had nothing to do with the murder of Lamont Adair and that the suspect had pled guilty to first degree murder and is sentenced to 50 years in prison for this crime.

50.     At 00:01:01 of Episode, this murder is introduced by showing the surveillance video of the murder and states, "The video is chilling because you just see the brazen act very clearly. -- My brother did not leave the house thinking he was going to die that day. He was the one who made the call for him to come up there. He was the one who put Lamont in a location to be the victim of this murder." See the Episode at 00:01:01. Then the Episode cuts to the introduction music.

51.     The Episode then continues to build the false narrative that the Plaintiff, Thomas, was "the one" who caused Lamont Adair to be in a location to be the victim of this murder.

52.     At approximately 00:07:14 of the Episode: Showing a video clip of an unknown black male face holding a phone up to his ear, explaining that the victim's sister had received a call while she was at the gas station and in the Episode she then states, "This guy that Lamont grew up with, he's like, 'your brother just got shot'. 'Just got shot? Like, what do you mean, he just got shot?' 'I don't know. Your brother just got shot.' Defendants knew and never mentioned in the Episode, that "this guy" that called the victim's family was in fact Plaintiff.

53.     In the Episode, the States Attorney explains that there were several cameras in the location of the murder, and it was made a priority the secure the footage.

54.     In another teaser leading up to commercials, showing footage of the gunman shooting Lamont, at 10:42:00, Defendants proceed with stating, "Investigators discover critical clues in Lamont's final moments. This person who shot Lamont knew him. A surprising motive emerges. The phrase everybody uses is "the streets are talking." There were several rumors that he was a snitch for the police and the killer's inner world is revealed." Then, the Episode it cuts to a woman (who is "Kenya") in a police interrogation room, stating, "he's hot headed, he gets angry" and then Defendants cut to commercial.

55.     After returning from that commercial break last showing the statements outlined in Paragraph herein above, at approximately 0:16:27, the Episode continues with: "A lot of people were upset with Lamont because of the opportunities that he has, and were all like, 'We know he was just about to go play basketball overseas.' Really a lot of people were jealous of him. He was headed for the basketball court not far from where he was shot and killed. Who was he meeting there? Were the people there that were supposed to be there? Where were the people that was suppose to meet if they weren't there? One of the people that Lamont may have been going to play basketball with was a man by the name of THOMAS. As they process the events of August 8th, Lamont's family have grown suspicious of the friend who invited him to play ball that afternoon. My brother did not leave the house thinking he was going to die that day. Thomas told Lamont, 'Lets go play basketball." People were going around saying that Thomas set it up, which we felt that way anyway because it was just too coincidental that you just call him and tell him to come up and play."

56.     At approximately 00:17:24 of the Episode, Defendants state, "Rumors suggest that Thomas may have coordinated with the gunman to get Lamont to Grieg Street." Cutting to Lamont's sister, stating, "If anyone were able to call him somewhere it would be Thomas because he trusted him." Then cutting to the States Attorney, stating "The indication was that he was plotting to do this to Lamont. There were rumors that he knew that it was happening, and he helped facilitate it" Then Defendants cut to commercial.

57.     Returning from that commercial break, the Episode then begins again at 00:17:54, with "Lamont's family have tipped off investigators to a friend who may have been involved in the murder." Then cutting again to the States Attorney, who said, "Thomas was somebody who

was on scene at the time of the murder. Detectives were looking at him as possibly being involved or at least not telling what he really knew about it.

58.     At 00:18:17, in the Episode they go on to state, "Thomas was one of the first names I gave to the detectives. He was the one who made the call for him to come up there. He was the one who got him to come out of the house. He was the one who put Lamont in a location to be the victim of this murder." Defendants continued to use this quote as a "teaser" before cutting to commercial and repeatedly use this edited quote to advertise the Episode on television, streaming sites, social networking and their website.

59.     For nearly half to entire episode, Defendants build up the audience to suspect and believe that Plaintiff had "set up" and was otherwise involved in this murder and helped facilitate it.

60.     Since airing of this Episode, countless people have watched it, including hundreds from the Seat Pleasant, Maryland area who personally know Plaintiff and all those involved and mentioned on the Episode.

61.     Because of this Episode, dozens of individuals have asked Plaintiff about Lamont Adair's murder and whether he was involved in "setting him up."

62.     Because of this Episode, Plaintiff and his family have received threats and have been unable to safely maintain any social presence in their hometown or surrounding areas.

63.     Because of this Episode, thousands of people now suspect that Plaintiff "worked with the gunman" or "knew" the gunman was going to shoot his friend, and "set up" his friend to be in a specific location "to be a victim of this murdered."

64.     Defendants have painted Plaintiff in a false light in order to gain a more dramatic narrative for their Episode and to lure more viewers into watching their show.

65.     Since and because of this Episode, Plaintiff has suffered tremendous amounts of harm and emotional distress.

66.     A true and correct copy of some of Defendant's versions of the publication and articles wherein the link to some of the versions of the Episode can be accessed that are found on Oxygen.com and Peacocktv.com are attached hereto as **Exhibit "A"** and are incorporated herein by reference.

**CAUSES OF ACTION**

**COUNT I**
**DEFAMATION**

67.     Plaintiff repeats and realleges each and every allegation in the paragraphs within this Complaint as though fully set forth at length herein.

68.     Despite Defendants having access to the investigation footage and documents, interviews with the detectives, and access Court records, Defendants still proceeded to create, promote, advertise, air, and stream the Episode - circulating multiple false and harmful statements about Plaintiff to millions of viewers.

69.     These statements and omissions have continued to infer and foster a false narrative that Plaintiff "knew about" and "set up" his friend to be murdered and/or "worked with the gunman" and was otherwise involved and facilitated the murder.

70.     Defendants used specific cuts of statements and audio, strategically placed directly before commercial breaks and used as "teasers" to draw viewers to keep watching, building up a narrative that Thomas would be exposed during the Episode as having "set up" Lamont Adair to be murdered.

71.     Specifically identifying Plaintiff by name, stating Thomas was "working with the gunman" and "made the call" and "put Lamont in the location" to be murdered implies to any and

all who heard or saw these statements that Plaintiff "set up" his friend Lamont Adair to be murdered, when in fact at all times, and Defendant is completely aware this is false.

72.    Defendants purposefully created the Episode to convince its audience that there were "secrets" about the investigation and that such secrets were that Plaintiff was working with the gunman, knew the gunman was going to shoot his friend, and set up his friend to be in a specific location to be murdered.

73.    Defendants specifically made such statements to damage Plaintiff's reputation and intentionally inflict emotional distress, and to encourage the public to believe the fabricated version of the events that took place.

74.    Defendants intended to mislead the public into believing that Plaintiff "set up" his friend to be murdered.

75.    Defendants knew the statements were false, or believing them to be true lacked reasonable grounds for such belief, and/or acted negligently in failing to ascertain the facts on which the publications were based, and therefore, Defendants are liable in the publications and negative implications that Plaintiff was working with the gunman, knowing at all times, he did not.

76.    Defendants knew the statements were false because at all times relevant, they had access to the investigation footage and documents, interviews with the detectives, and access Court records, Defendants still proceeded to create, promote, advertise, air, and stream the Episode - circulating multiple false and harmful statements about Plaintiff to millions of viewers.

77.    The defamatory statements and Episode create and makes apparent a substantial danger to Plaintiff's reputation and accuse and infer that he committed a violent crime of moral turpitude.

78.     Defendant has permanently ruined Plaintiff's reputation and placed Plaintiff into a highly offensive false light for the remainder of his life because there is no safe or feasible way to restore the his reputation.

79.     Defendants intentionally neglected or completely failed to recognize social constructs in communities like Seat Pleasant, where violence, revenge and retribution are prevalent.

80.     Defendant completely disregarded how the release of this Episode could impact Plaintiff and his family's everyday life, as they failed to consider the consequences Plaintiff would face upon being labeled as someone who "set up" the murder of a very popular and largely loved individual.

81.     Defendant's decision to make false statements about Plaintiff was beyond reckless and has without a doubt endangered the lives of Plaintiff and his family which include multiple small children.

82.     As a direct and proximate result of Defendant's conduct, by and through their employees and/or agents, Plaintiff has suffered and continues to suffer damages and harm including but not limited to: receiving death threats and threats of retaliation; being harassed at his place of employment and while out in public; public humiliation; severe emotional harm; impairment to his reputation; loss of ability to live freely and without threat of death or serious physical harm; and suffered and continues to suffer from extreme stress, loss of sleep, depression, sadness, frustration, and physical pain and suffering; and Plaintiff has incurred legal expenses related to this instant action.

## <u>COUNT II</u>
## FALSE LIGHT, INVASION OF PRIVACY AND APPROPRIATION

83.    Plaintiff repeats and realleges each and every allegation in the paragraphs within this Complaint as though fully set forth at length herein.

84.    Defendant published false or misleading statements and aired the Episode and placed Plaintiff in an extremely highly offensive false light, one that caused others to speculate, assume, and conclude that he was "working with the gunman" and "knew about" the gunman's plan to shoot his close friend Lamont Adair, and that Plaintiff "made the call" and "set it up" so that Lamont Adair was the "victim to this murder."

85.    Defendants made false or misleading statements that lead any and all reasonable viewers to listeners to believe that Plaintiff was "jealous" of Lamont Adair and that he set him up to be murdered because he was jealous of his basketball career plans.

86.    Defendants caused a negative and inaccurate impression of Plaintiff.

87.    Defendants identified Plaintiff by name and to an audience that included hundreds of viewers from Seat Pleasant, Maryland area who know Plaintiff, Thomas Logan and knew Lamont Adair.

88.    Defendants utilized commercial breaks and strategic editing techniques to cut specific phrases and place them "out of order" so when viewed together collectively out of order, it created a false narrative that there was a "secret" to be revealed in the episode.

89.    Defendants utilized commercial breaks and strategic editing techniques to cut specific phrases and place them "out of order" so when viewed together collectively out of order, it created a false narrative that: "Investigators discover critical clues in Lamont's final moments. This person who shot Lamont knew him. A surprising motive emerges. The phrase everybody uses is "the streets are talking" There were several rumors that he was a snitch for the police and the

killer's inner world is revealed." Then, the Episode it cuts to a woman (to be identified as 'Kenya')

in a police interrogation room, stating, "he's hot headed, he gets angry" and then cuts to

commercial. Upon returning from this commercial break, Defendants identify Thomas by name

and create the offensive and false impression that he was "jealous" and that he was "working with

the gunman" to "set up" his friend and "made the call" that caused Lamont to be murdered.

90.    Defendants repeatedly used footage of an unknown black male "actor" to portray

Thomas, without Thomas' permission.

91.    Defendants utilize "real" footage of every other person throughout this

Documentary and at no time clarify to the audience that the "actor" is not Thomas.

92.    This Episode has caused Thomas to suffer an enormously large level of negative

public attention.

93.    At all times, Defendant knew the false light would cause negative attention towards

Plaintiff, however, they intentionally created this false light by strategically editing their Episode

in a manner that would create an even more "dramatic" false narrative so their Episode would be

more interesting and profitable.

94.    Despite Defendants having access to the investigation footage and documents,

interviews with the detectives, and access Court records, Defendants still proceeded to create,

promote, advertise, air, and stream the Episode - circulating multiple false and harmful statements

about Plaintiff to millions of viewers.

95.    These statements and omissions have continued to infer and foster a false narrative

that Plaintiff "knew about" and "set up" his friend to be murdered or "worked with the gunman"

and was otherwise involved and "facilitated" the murder.

96.     Specifically identifying Plaintiff by name, stating Thomas was "working with the gunman" and "made the call" and "put Lamont in the location" to be murdered implies to any and all who heard or saw these statements that Plaintiff "set up" his friend Lamont Adair to be murdered, when in fact at all times, and Defendant is completely aware this is false.

97.     Because of this Episode, countless people have contacted Plaintiff and his family inquiring about Plaintiff's "involvement" in Lamont Adair's murder.

98.     Defendants purposefully created the Episode to convince its audience that there were "secrets" about the investigation and that such secrets were that Plaintiff was working with the gunman, knew the gunman was going to shoot his friend, and set up his friend to be in a specific location to be murdered.

99.     Defendants specifically made such statements to damage Plaintiff's reputation and intentionally inflict emotional distress, and to encourage the public to believe the fabricated version of the events that took place.

100.    Defendants intended to mislead the public into believing that Plaintiff "set up" his friend to be murdered.

101.    Defendants knew the statements were false, or believing them to be true lacked reasonable grounds for such belief, and/or acted negligently in failing to ascertain the facts on which the publications were based, and therefore, Defendants are liable in the publications and negative implications that Plaintiff "knew about" and "set up" his friend to be murdered or "worked with the gunman" and was otherwise involved and "facilitated" the murder, knowing at all times, Plaintiff did not.

102.    Defendant has permanently ruined Plaintiff's reputation and placed Plaintiff into a highly offensive false light for the remainder of his life because there is no safe or feasible way to restore the his reputation.

103.    Defendants intentionally neglected or completely failed to recognize social constructs in communities like Seat Pleasant, where violence, revenge and retribution are prevalent.

104.    Defendant completely disregarded how the release of this Episode could impact Plaintiff and his family's everyday life, as they failed to consider the consequences Plaintiff would face upon being labeled as someone who "set up" the murder of a very popular and largely loved individual.

105.    Defendant's decision to place Plaintiff in this false light was beyond reckless and has without a doubt endangered the lives of Plaintiff and his family which include multiple small children.

106.    As a direct and proximate result of Defendant's conduct, by and through their employees and/or agents, Plaintiff has suffered and continues to suffer damages and harm including but not limited to: receiving death threats and threats of retaliation; being harassed at his place of employment and while out in public; public humiliation; severe emotional harm; impairment to his reputation; loss of ability to live freely and without threat of death or serious physical harm; and suffered and continues to suffer from extreme stress, loss of sleep, depression, sadness, frustration, and physical pain and suffering; and Plaintiff has incurred legal expenses related to this instant action.

## COUNT III
## TORT OF OUTRAGE

107.   Plaintiff repeats and realleges each and every allegation in the paragraphs within this Complaint as though fully set forth at length herein.

108.   Defendant's actions in creating and publishing the Episode are extreme, outrageous, and are not to be tolerated in a decent and civilized society.

109.   Defendant's actions in creating and publishing the Episode caused Thomas severe emotional distress, and Defendants knew or should have known that he would suffer because of their actions.

110.   Defendants claimed directly to Thomas and in their Episode that there were "secrets" related to the murder of his friend, and then that Thomas was "jealous" and "set up" his close friend to be murdered and "made the call" that caused his friend to be murdered, but his murder was in fact admitted to by the true gunman, Franklin Scott, who plead guilty to first degree murder and Thomas had absolutely nothing to do with it. At all times, Defendant knew this.

111.   Defendants used specific cuts of statements and audio, strategically placed directly before commercial breaks and used as "teasers" to draw viewers to keep watching, building up a narrative that Thomas would be exposed during the Episode as having "set up" Lamont Adair to be murdered.

112.   Specifically identifying Plaintiff by name, stating Thomas "knew about" and was "working with the gunman" and "made the call" and "put Lamont in the location" to be murdered implies to any and all who heard or saw these statements that Plaintiff "set up" his friend Lamont Adair to be murdered, when in fact at all times, and Defendant is completely aware this is false.

113.   Defendants purposefully created the Episode to convince its audience that there were "secrets" about the investigation and that such secrets were that Plaintiff.

18

114.    Defendant, OXYGEN continues to publish this Episode and various clips and "teasers" and advertises it on their website, commercials, and various social media pages. This Episode is still portrayed as one where a young man was murdered because his peers were "jealous" of his aspiring basketball career and that Defendants had "secrets" related to his murder that would be revealed during the Episode.

115.    Defendant's publications about Thomas in the Episode and in their articles about the Episode were false. The statements are false because Thomas did not work with the gunman, or know the gunman's plans to shoot Lamont Adair, Thomas did not "make the call" or otherwise "set up" Lamont Adair to be murdered, and he did cooperate with the detectives, and he was not "jealous" of his friend. At all times, Defendant knew the outcome of the investigation and Defendants knew the fact that Franklin Boyd pled guilty to murdering Lamont Adair. Defendants knew that Thomas was not involved in this murder and that he was a close friend of Lamont Adair who was murdered while going to meet up with him.

116.    Defendants statements were made with actual malice in that Defendants knowingly and recklessly made numerous factual, false, and outrageous statements regarding their purported "secrets" uncovered about the final moments of Lamont Adair.

117.    Defendants statements were made with actual knowledge of falsity or with reckless disregard for the truth.

118.    Defendants strategically edited the statements in such a manner to create a false narrative and to create a dramatic build up of events in efforts to lure in viewers.

119.    Defendants already knew the truth about Lamont Adair's murder prior to the creation and airing of the Episode and at all times they knew Thomas had nothing to do with the murder of his friend Lamont Adair.

120.    Defendants continue to advertise their "true crime" series "Final Moments" using clips and footage from the Episode, *The Streets Are Talking."*

121.    Defendants knew prior to publishing the Episode that there were no "secrets" uncovered and that Plaintiff was not involved in the murder of his friend but scripted the Episode in such a manner to cause all viewers to believe and suspect that Thomas had "known about" and "set up" his friend when he called Lamont Adair to play basketball with him that day.

122.    Defendants knew or recklessly disregarded prior to publishing the Episode that they had not discovered Thomas to be involved, know about, facilitate, or "make the call."

123.    Defendants knew or recklessly disregarded prior to publishing the Episode that the gunman had pled guilty to first degree murder and there are no "secrets" to be discovered.

124.    Defendants recklessly disregarded the emotional well-being of Plaintiff and only had goals to capitalized on the murder-story of his close friend.

125.    Defendants conduct emotionally tormented Plaintiff as he watched the Episode on National television network stations wondering if there were "secrets" or wondering why Defendants would be accusing him of being involved in the murder of his friend.

126.    Defendants conduct forced Plaintiff to have to explain to countless of others that he was not involved and he did not "set up" Lamont Adair to be murdered.

127.    Defendant's conduct has forced Plaintiff to relive the emotionally traumatizing day when he was going to meet his close friend and instead witnessed him being murdered.

128.    Defendant's conduct has caused hundreds or thousands of others to speculate and assume that Plaintiff was involved in the murder of Lamont Adair and was not caught by the authorities.

129.    Defendant's conduct has put Plaintiff and his family in immediate danger and fear of death or violent retaliation because others truly believe because of the Episode that Plaintiff "made the call" that got Adair Lamont murdered.

130.    Defendants' misconduct cannot be tolerated in a civilized society.

131.    Defendants intended to, knew, should have known, or recklessly disregarded that their conduct would, cause Thomas grievous emotional injury.

132.    Defendants' misconduct was willful, reprehensible, and demonstrates that entire want of care that raises a presumption of conscious indifference to consequences.

133.    Oxygen completely disregarded how the release of this Episode could impact my client and his family's everyday life, as they completely failed to consider the social constructs in communities like Seat Pleasant, Maryland where violence, revenge and retribution are prevalent. They also completely ignored the emotional well-being of THOMAS, an individual who has already been traumatized by this violent crime.

134.    As a direct and proximate result of Defendant's conduct, by and through their employees and/or agents, Plaintiff has suffered and continues to suffer damages and harm including but not limited to: receiving death threats and threats of retaliation; being harassed at his place of employment and while out in public; public humiliation; severe emotional harm; impairment to his reputation; loss of ability to live freely and without threat of death or serious physical harm; and suffered and continues to suffer from extreme stress, loss of sleep, depression, sadness, frustration, and physical pain and suffering; and Plaintiff has incurred legal expenses related to this instant action.

## <u>COUNT IV</u>
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

135.   Plaintiff repeats and realleges each and every allegation in the paragraphs within this Complaint as though fully set forth at length herein.

136.   Defendants participated in an intentional and discriminatory course of action that a reasonable person would find extreme and outrageous because it falls well outside the bounds of decency.

137.   Defendant's conduct toward Plaintiff was extreme and outrageous. Defendants intentionally caused Plaintiff's emotional distress by including but not limited to: airing the Episode to millions of viewers, including Plaintiff, making false statements and placing Plaintiff into a false light wherein Defendants imply and accuse Plaintiff of being jealous of his close friend, and "knowing about" and setting him up to be murdered, by working with the gunman and "making the call" causing his friend, Lamont Adair to be murdered.

138.   Defendants failed to ever contact Plaintiff about the creation of the Episode, never asked for any clarifying information, and never warned him this Episode would be identifying him and using an actor to portray him.

139.   Defendants took the aforementioned actions with reckless disregard of Plaintiffs' emotional well-being and did not consider the fact that Plaintiff had to already bear witness to his close friend's murder – a traumatizing and horrific scene he must live with every day - but also to now be accused by millions for "setting it up," Defendants have caused Plaintiff and his entire family to essentially go into social hiding, as he receives violent threats, been threatened at his place of employment, and has had to completely avoid all social gatherings in his own community and otherwise remove himself from Seat Pleasant area.

140.    As a direct and proximate result of Defendant's conduct, by and through their employees and/or agents, Plaintiff has suffered and continues to suffer damages and harm including but not limited to: receiving death threats and threats of retaliation; being harassed at his place of employment and while out in public; public humiliation; severe emotional harm; impairment to his reputation; loss of ability to live freely and without threat of death or serious physical harm; and suffered and continues to suffer from extreme stress, loss of sleep, depression, sadness, frustration, and physical pain and suffering; and Plaintiff has incurred legal expenses related to this instant action.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts set forth herein.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff, Thomas Logan, respectfully prays the entry of judgment against the Defendants, Oxygen Media, LLC, to include:

A.    A trial by jury;

B.    That judgment be entered against Defendants, jointly and severally where applicable, for compensatory damages in an amount not less than $15 Million ($15,000,000.00);

C.    That judgment be entered against Defendants, jointly and severally where applicable, for punitive damages to punish and deter Defendants in an amount not less than $30 Million ($30,000,000.00);

D.    That judgment be entered against Defendants for attorneys' fees, costs, and interest; and

E.    Such other relief as this Court deems equitable, just, and proper.

**I DO HEREBY DECLARE AND AFFIRM UNDER THE PENATLIES OF PERJURY THAT THE CONTENTS OF THE FOREGOING ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEGDE, INFORMATION, AND BELIEF.**

*/s/Thomas Logan*
Thomas Logan, *Plaintiff*

Filed: May 1,  2023

By and through his counsel

*/s/Charles Tucker, Jr. Esq.*
Charles Tucker, Jr., Esq., *Managing Partner*
MD Bar # 0808260001
Megan B. Betts, Esq., *Associate*
MD Bar # 2207280012
The Cochran Firm - Hyattsville
8181 Professional Place
Hyattsville, MD 20785
Email: charles@tuckerlawgroupllp.com
Email: megan@tuckerlawgroupllp.com
Telephone: 301-577-1175
Facsimile: 240-467-5787